# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Lee D. Vartan
(212) 513-3513
lee.vartan@hklaw.com

May 29, 2017

*Via ECF*

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Christopher Campos*, 16 Cr. 395 (VEC)

Dear Judge Caproni:

      We represent defendant Christopher Campos in the above-referenced action. On May 26, the government informed Mr. Campos that, at trial, it intends to introduce selected excerpts of certain recordings between Mr. Campos and Susan Austin.[1] By this letter motion, Mr. Campos seeks the admission of all recordings between himself and Ms. Austin pursuant to Federal Rule of Evidence 106 and the common-law doctrine of completeness. Some context is necessary.

      Sometime in the fall of 2012, Julio Alvarez, along with Norberto Taveras and Geuris Ramos, struck upon the livery leasing business model that is at the heart of this case. Months later, Mr. Campos was introduced to what was by then a mature business. Dozens of cars had been purchased from several New York-based car dealerships, and a number had been re-titled and were on the City streets as livery cabs. Mr. Alvarez explained how the business worked, and further explained that, through Mr. Taveras, the dealerships from which the cars were purchased were both aware of and approved of Mr. Alvarez' business model. No one—not Mr. Alvarez, Mr. Taveras, or anyone—said or even implied to Mr. Campos that the dealerships were forging documents or providing false information to banks. Indeed, there was no discussion of the financing end of the business. Mr. Campos had no reason to think that some of the largest dealerships in New York and New Jersey would breach their fiduciary duty and contractual obligations to their bank partners and risk prosecution to make some extra money. But that is precisely what happened—all unbeknownst to Mr. Campos.

---

[1] The government has not yet identified the specific recordings it intends to introduce.

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa | Tysons
Washington, D.C. | West Palm Beach

May 29, 2017
Page 2

There is perhaps no better evidence of this than Mr. Campos's own actions. After Messrs. Alvarez and Taveras explained the business to him, Mr. Campos was excited. He believed the business to be the next Uber. Mr. Campos, however, was unable to become personally involved as an investor because of his poor credit. So, he did the next best thing—he involved his family and his friends. He introduced his cousin and brother to the business, he attempted to introduce his elderly father, and even introduced his wife. Had he believed he had just signed onto a conspiracy to commit bank fraud, those closest to him would have been furthest away. Instead, he brought them to Julio Alvarez with the hope and expectation that they would collectively profit. Mr. Campos introduced only one non-family member to the business, Susan Austin, a co-worker of a close friend.

The evidence at trial will show that, although introduced to the business by Mr. Campos, Ms. Austin met with Mr. Alvarez in-person and completed her own due diligence before becoming an investor. She proceeded to buy 21 cars from several dealerships in New Jersey. But for Ms. Austin, there was a problem. She resided in New Jersey and the cars were titled to her there. For the cars to be leased as livery cabs, they first had to be re-titled as livery cars and registered with the New York City Taxi & Limousine Commission. For cars titled in New York, the process involves a simple change of registration. For cars titled in New Jersey, the process is considerably more complicated. As a result, Ms. Austin's 21 cars sat on Mr. Alvarez' lot—a significant expense for the company with no offsetting revenue.

Julio Alvarez and his business was unable to pay for Susan Austin's cars, and Ms. Austin was barraged by banks demanding payment. In the fall of 2013, she turned to Chris Campos for help. And Mr. Campos provided help. He did more for her than he did for his own family—providing counsel, negotiating with banks (in at least once case successfully), and generally helping her weather what they both then believed was a business investment gone bad. It was all done in the context of what Chris Campos and Susan Austin understood to be an attorney-client relationship, albeit one for which Mr. Campos received no compensation.

Ms. Austin repaid Mr. Campos's generosity by becoming a government cooperator. Her decision was likely an easy one since, unlike Mr. Campos, she had made material misstatements throughout her involvement with the business. She routinely lied to banks when they called demanding payment, telling them the cars were garaged at her home in New Jersey when they were not and misrepresenting employees of Mr. Alvarez' business as her relatives. Most egregiously, she lied to banks, state divisions of motor vehicles, or both by telling them that she had moved to 89 Saint Nicholas Place—Mr. Alvarez's business address—in an attempt to get her cars re-titled as livery cars so they could be registered with the Taxi & Limousine Commission and leased to drivers.

The fruits of Ms. Austin's cooperation were a number of recordings between Ms. Austin and Mr. Campos, as well as Ms. Austin and Mr. Alvarez, between February and May 2014. The conversations between Ms. Austin and Mr. Campos span weeks, but are really best understood as a single conversation where Ms. Austin clumsily tries to get Mr. Campos to admit he committed

May 29, 2017
Page 3

bank fraud. She was unsuccessful. Undeterred, the government now seeks to excerpt certain statements made by Mr. Campos to convict him based on a stray comment or two, presumably without context. The government has already revealed its strategy in its *in limine* motions.

In its motions, the government excerpts several pieces of longer conversations between Mr. Campos and Ms. Austin to demonstrate that Mr. Campos "strategized how [he and Mr. Alvarez] could pay off the car loans or have the cars repurchased in order to avoid prosecution." Government's Motions *In Limine* at 4 [Docket Entry #71]. Isolated and without context, the excerpted statements seem to support the government's argument. In their proper context, however—meaning placed alongside the full recordings made by Ms. Austin—they do not. Played in order and in full, the recordings reveal a real estate attorney doing his best impression of a criminal defense attorney and advising his client on her potential criminal exposure and how to minimize that exposure. The advice is no different from the advice defense attorneys provide to their clients every day. A few excerpts from the recordings will make Mr. Campos's point.

>   **AUSTIN:** Why did we [say the cars were for personal use]?
>
>   **CAMPOS:** That's what you were advised to do by the dealerships . . . by Orlando. Remember, he and Julio had this thing all mapped out. Right? When you met him?
>
>   **AUSTIN:** Wait. I'm sorry.
>
>   **CAMPOS:** I said he and Julio had this thing all mapped out. Right? When you met him, they told you, "This is what you need to do." Right? You went to the dealership. They advised you every step of the way. Am I right about that? Because I wasn't there the day you were there. But isn't that what happened?
>
>   **AUSTIN:** Yes.
>
>   **CAMPOS:** OK. So you were advised to do that.
>
>   …
>
>   **AUSTIN:** But it's still fraud. It's bank fraud.
>
>   **CAMPOS:** I mean, bank fraud, I mean, this is what we've been talking about for a while now. Yes, but who committed the fraud? The dealerships. You signed the documents, yes, but who put this whole thing together, which is the dealerships and Julio. And this is what they did.
>
>   ...

May 29, 2017
Page 4

      **CAMPOS:**    I don't know what you were supposed to do in terms of what they had advised you of.

(Recording from February 19, 2014). As she did throughout the recordings, Ms. Austin was attempting to bait Mr. Campos into admitting that he, like her, committed bank fraud.[2] Mr. Campos, of course, had no knowledge that she was being directed by the FBI. He believed that she was seeking legal guidance and advice from him, which he provided. And his advice was accurate. Susan Austin had not committed bank fraud. She had been directed by Mr. Alvarez, Mr. Perez, and the dealerships; she had no intent to defraud. A later conversation continued the theme:

      **CAMPOS:**    What bank fraud did you commit?

      **AUSTIN:**    Using multiple, using multiple banks to buy these cars.

      **CAMPOS:**    But you didn't do that. You didn't do that.

      **AUSTIN:**    I did. I signed the paperwork.

…

      **CAMPOS:**    But you didn't submit it to the bank. They did. They put it all together. So I am still confused as to . . . the only issue, that I, that could be, that I believe was identified is that you didn't purchase a car personally. Right?

...

      **CAMPOS:**    You are the least of the culpable persons when it comes to bank fraud.

      **AUSTIN:**    I might be the least, but I'm not absolved. Do you understand? I still did it. Whether I had intent, intentionally did it, or not, I did it. And that's how it is perceived.

      **CAMPOS:**    But intent is part of the crime. You have to have the intent to commit a crime, and you have to have the action to commit a crime. So, if you are being told that this is how the structure of a legal deal goes down, and they explain to you, and they actually facilitated it, I mean, how do they come after you and not the dealership?

…

---

[2] Of course, Ms. Austin did not really believe she had committed bank fraud. She was merely parroting what the FBI instructed her to say.

May 29, 2017
Page 5

    **CAMPOS:**    I don't believe you committed bank fraud, but that's my opinion. . . . Is the FBI looking for you to cooperate in order to prosecute someone else, maybe?

(Recording from March 5, 2014). Two days later, Susan Austin picked up where she had left off:

    **AUSTIN:**    So, where are we?

…

    **CAMPOS:**    I think getting rid of the vehicles, paying them off, putting yourself in the best position to deal with the second part of this, you know, is the most important thing. Like, alleviating the financial obligation, you know what I mean, so that you are not getting these phone calls, so the banks are being paid off. So, can you, the thing that I need from you, is I need you to call and get payoff amounts for each vehicle.

...

    **AUSTIN:**    But the cars all came, were financed by different banks.

    **CAMPOS:**    OK.

    **AUSTIN:**    And he said that's bank fraud.

    **CAMPOS:**    Wait, no. At the time, did you know that?

    **AUSTIN:**    No, I did not.

    **CAMPOS:**    Exactly. And at the time, did you have an intent to do that?

    **AUSTIN:**    No I did not. But ignorance of the law is no excuse.

    **CAMPOS:**    But that is not necessarily true when you don't have the mental . . . you have two different elements to a crime, the mens rea and the actus rea. The action and the mental desire to commit the crime.

…

    **CAMPOS:**    You mean to tell me you believe that the FBI, the federal government, is going to prosecute Susan for bank fraud, and not prosecute the dealership? And why would they even go after you if they are not going after the dealership?

    **AUSTIN:**    You don't know that.

May 29, 2017
Page 6

>    **CAMPOS:** Wait a minute. And if the vehicles are paid off, where is the . . . there is no . . . it becomes victimless.
>
>    …
>
>    **CAMPOS:** But I think the most important thing right now is to focus not on the secondary issue, but the first issue, which is what are we going to do with these 21 cars that are sitting there. That have been sitting there for almost 9 months now.
>
>    **AUSTIN:** True.

(Recording dated March 7, 2014). In its *in limine* motions, the government pretended this conversation away, excerpting a later conversation between Ms. Austin and Mr. Campos that covered the same topics. Government's Motions *In Limine* at 4-7. The government argued that the later conversation was evidence that Mr. Campos was focused on getting Ms. Austin's cars paid off to stave off prosecution for himself. While that argument may have some plausibility when a single conversation is heard in isolation, it is implausible when placed in the context of the larger dialogue between the two. Ms. Austin was pretending to believe that she had committed bank fraud. Mr. Campos, serving as her attorney, provided her with his legal opinion that she had not, including ways to mitigate her criminal and civil exposure for her benefit, not his.

The larger conversation should thus be admitted so as to place the government's cherry-picked excerpts into context and not mislead the jury. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a . . . recorded statement, the adverse party may require the introduction, at that time, of any other part—or any other . . . recorded statement—that in fairness ought to be considered at the same time."); *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987) ("Under [Rule 106], the omitted portion of a statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion."); *United States v. Southland Corp.*, 760 F.2d 1366, 1378 (2d Cir. 1985) ("This is a principle of simple justice, long antedating the Federal Rules of Evidence."); *accord United States v. Webber*, 255 F.3d 523, 526 (8th Cir. 2001) ("Rule 106 may in some cases require that all or portions of a series of recorded conversations be played to avoid misleading the jury."); *United States v. Shields*, 783 F. Supp. 1094, 1096 (N.D. Ill. 1991) (granting defendant's motion to compel the government to play entire series of recordings between defendant and cooperating witness, pursuant to Rule 106, when the government had only designated portions of selected recordings).

Beyond the legal advice Mr. Campos provided on the recordings, the full recordings actually exculpate Mr. Campos. Again, a few excerpts make the point.

>    **CAMPOS:** At this point, Susan, I like really want to say, like, you got to do what you got to do in terms of dealing with this. . . . Did you ever meet with the FBI?

May 29, 2017
Page 7

> **AUSTIN:** No, I haven't done that yet.
>
> …
>
> **CAMPOS:** I mean that's part of, you know. . . .  I don't know how that affects you as a, as a, you know like a card you play.  In other words, like, yo, I'm a victim, this person told me. . . .  Not that you didn't know about the business opportunity, but this opportunity has fallen apart.  You were misled to believe that this could happen, and this was this and this was that.  And you know, cards fall where they may.  Because you shouldn't be victimized repeatedly, right, for or an opportunity that they're not adhering to.  I mean, they're not even respecting you enough to call you.  But don't do that yet, don't hit the nuclear button yet.  Let me see if [Mr. Alvarez] will respond.

(Recording from February 19, 2014).  Mr. Campos did not object to Ms. Austin going to the FBI.  There was no, "no," or "stop," or "don't be crazy."  There was simply measured advice from Mr. Campos.  He offered to speak with Mr. Alvarez first, and if that failed, invited Ms. Austin to speak with the FBI—let the "cards fall where they may."  Those are not the words of someone who believes he committed bank fraud.

> A later conversation proceeded as follows:
>
> **CAMPOS:** I believe you are of the opinion the sooner you can get, let's just say if you could sell the cars, or you could deal with the financial obligation of the cars, that you would be willing to entertain any and all options.  Am I right about that?
>
> **AUSTIN:** Legal options.  Yes.
>
> **CAMPOS:** That's what I mean.  I mean, I wouldn't be talking about anything but legal options.  What do you think we would be talking about?

(Recording dated March 7, 2014).

Such exculpatory statements provide additional grounds for admitting all of the recordings.  *See, e.g, United States v. Yousef*, 327 F.3d 56, 153 (2d Cir. 2003) (explaining that the rule of completeness is violated where the admission of a statement in redacted form "excludes information substantially exculpatory of the declarant"); *accord United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993) (holding that district court erred in excluding exculpatory portion of defendant's statement when the government had introduced an inculpatory portion of the statement).

May 29, 2017
Page 8

        Respectfully Submitted,

        HOLLAND & KNIGHT LLP

        /s/ Lee Vartan

        Lee D. Vartan

        *Attorney for Christopher Campos*