# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Lee D. Vartan
(212) 513-3513
lee.vartan@hklaw.com

June 2, 2017

*Via ECF*

Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *United States v. Christopher Campos*, 16 Cr. 395 (VEC)

Dear Judge Caproni:

    I write at Your Honor's request concerning audio recordings made by cooperating witness Susan Austin between February 19, 2014 and March 28, 2014. In all instances but one, the recordings involve telephone calls between Ms. Austin and Mr. Campos. The exception is an in-person meeting that included Ms. Austin, Mr. Campos, and Julio Alvarez. The government has distilled approximately 8 hours of recordings to six excerpts. (*See* Attachment A hereto). Mr. Campos has argued that the government's distillation is misleading, and has argued that Federal Rule of Evidence 106 and the common-law doctrine of completeness require admission of all of the recordings [Docket Entry #92]. In the alternative, Mr. Campos seeks the admission of the excerpts attached to this filing as Attachment B to provide necessary context to the government's excerpts and avoid misleading the jury. Some brief background is necessary.

    Susan Austin worked with Mr. Campos's close friend. Through his friend, Mr. Campos learned that Ms. Austin was looking for an investment opportunity, and he introduced her to Julio Alvarez and 195 Leasing Corporation. Ms. Austin was the only non-family member that Mr. Campos brought to the business.

    Sometime in or about April 2013, Ms. Austin, along with her brother, met with Mr. Alvarez and Mr. Campos in-person and ultimately decided to become an investor in 195 Leasing based on Mr. Alvarez' explanation of his business model. She went on to purchase 21 cars across several dealerships in New Jersey. But there was a problem with her cars. Because Susan Austin lived in New Jersey and her cars were titled there, she could not easily re-title them in the name of 195 Leasing Corporation—a necessary first step to get the cars registered with the New York City Taxi

& Limousine Commission and ultimately leased to livery cab drivers.[1] Ms. Austin's cars sat in a lot unused, but whether leased to livery drivers or not, the financing companies still had to be paid each month. Mr. Alvarez quickly fell behind on the payments due on Ms. Austin's cars. She was barraged with calls from banks; she needed help. And she sought help from Chris Campos.

Indeed—and this is crucial—she sought help from Chris Campos as early as September 2013. He was functioning as her attorney, albeit an unpaid one. On or about September 23, 2013, Mr. Campos successfully negotiated the return of one of Ms. Austin's cars with Route 22 Honda and Gateway One Lending and Finance. The e-mail reflecting that negotiation called Ms. Austin his "client." In a December 2013 text message exchange, a despondent Susan Austin asked Mr. Campos—her lawyer—"can I get arrested for not turning in the Hondas that Honda financial is trying to repossess[?]" The following conversation ensued:

>    Mr. Campos:    No, that's BS…. They say that all the time, you hired a lawyer to represent u on this.. therefore. Going forward u tell them to deal with your lawyer.
>
>    Mr. Campos:    Law offices of christopher campos. 2017937200.
>
>    Ms. Austin:    Thank you Chris. I really appreciate you.
>
>    Mr. Campos:    Np. It was never supposed to be like this. But let's fix it.. all calls should be directed at your lawyer.
>
>    Ms. Austin:    Ok.

The point, of course, is that well before Ms. Austin turned government cooperator, she had turned to Mr. Campos for legal advice and help.

The government pretends away all of the interactions between the two prior to February 2014, preferring to construct a new narrative where a fevered Chris Campos supposedly harangued and harassed Susan Austin for payoff amounts so that losses could be mitigated and he could avoid prosecution. That is the only conclusion to be drawn from the government's excerpts. And, indeed, the government acknowledged its invented narrative in its filings, writing, "During these conversations [with Susan Austin], Alvarez and Campos strategized how they could pay off the car loans or have the cars purchased in order to avoid prosecution." (Government's Motions *In Limine* at 4). Mr. Campos's narrative is different—and consistent—from September 2013 through March 2014: in every one of his conversations with Susan Austin, Mr. Campos was variously trying to calm Ms. Austin, explain to her why she had not committed any crime, and provide her

---

[1] New York is considered a "weak title" state, and, accordingly, it is a fairly simple process for an owner to re-title her car from personal to commercial use in New York. The same is not true in New Jersey where the financing company, not the owner, holds title.

with legal advice to mitigate her criminal and civil exposure. The conversations were for her benefit, not his.

It is because of these dueling narratives that all of the recordings should be admitted in evidence. The recordings span weeks, but they are really one, long continuing conversation between an attorney and his client seeking legal advice. Indeed, put in the broader context of the e-mails and text messages noted above, they are really one, long continuing conversation spanning months. To be clear, Mr. Campos is not seeking to play 8 hours of recordings for the jury. But he does believe that the jury should have the ability to listen to all of the recordings for themselves and determine whose narrative is more plausible. This notion of fairness through completeness is the very essence of Federal Rule of Evidence 106, and it seems anomalous that the government wishes to hide from the jury the very evidence it endeavored to create. *See, e.g., United States v. Southland Corp.*, 760 F.2d 1366, 1378 (2d Cir. 1985) ("This is a principle of simple justice, long antedating the Federal Rules of Evidence."); *accord United States v. Webber*, 255 F.3d 523, 526 (8th Cir. 2001) ("Rule 106 may in some cases require that all or portions of a series of recorded conversations be played to avoid misleading the jury."); *United States v. Shields*, 783 F. Supp. 1094, 1096 (N.D. Ill. 1991) (granting defendant's motion to compel the government to play entire series of recordings between defendant and cooperating witness, pursuant to Rule 106, when the government had only designated portions of selected recordings).

If the Court disagrees that all of the recordings should be admitted in full, then we ask that the excerpts identified in Attachment B be admitted to "explain the admitted portion[s] [in Attachment A], to place the admitted portion[s] [in Attachment A] in context, to avoid misleading the jury, [and] to ensure fair and impartial understanding of the admitted portion[s]." *United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987). The excerpts identified by Mr. Campos do precisely that. By way of example, several of the excerpts demonstrate that Mr. Campos did not think that he or Ms. Austin committed bank fraud. On March 18, 2014, the following conversation unfolded:

> Ms. Austin: So why are you -- why are not concerned about that?
>
> Mr. Campos: Because [unintelligible] concerned about that. Why ca-, why am I going to be concerned? I gave you advice about a business decision that you made, and, and my wife made it -- I don't believe that I was committing any kind of bank fraud. I don't believe my wife committed any kind of bank fraud. I don't believe that you committed bank fraud. If you want to believe that, I can't argue with you.
>
> Ms. Austin: But that -- but when I first mentioned to you that that's what the FBI mentioned you, you were not happy about it.
>
> Mr. Campos: Of course I'm not --

    Ms. Austin: And now you just seem very, very calm, but now you're like very calm, so I just want to know how do I get to be calm? Because right now I'm still --

    Mr. Campos: Because Susan you got to make a choice whether or not you're going to be calm or not. I can't make that choice. I'm not going to live my life -- I've spoken to every person that I know involved in, in, in car dealerships, in, in as attorneys and everything. I said look, there was a business deal that I thought was correct, I was made to believe that the dealership, you know, approved it. The dealership actually gave money to the people involved in this thing, and, and I thought people -- and I referred people to be involved in it. So much so that I put my family at risk. Now I'm learning that the thing was not right. Yes, that's wrong. There's a problem here, but to suggest that there was any criminality because I put people together? . . .

Other conversations demonstrate that Mr. Campos always told Ms. Austin to tell the truth. For example, on March 7, 2014, the following conversation was had:

    Mr. Campos: I believe you are of the opinion the sooner you can get, let's just say if you could sell the cars, or you could deal with the financial obligation of the cars, that you would be willing to entertain any and all options. Am I right about that?

    Ms. Austin: Legal options. Yes.

    Mr. Campos: That's what I mean. I mean, I wouldn't be talking about anything but legal options. What do you think we would be talking about?

Two days later, Ms. Austin recorded the following exchange:

    Mr. Campos: When you told me they wanted me to change my address what did I tell you?[2]

    Ms. Austin: "You can't."

    Mr. Campos: "You can't," right?

    Ms. Austin: Mm-hmm.

---

[2] The second "me" refers to Susan Austin. This conversation concerns footnote 1 *supra*. It is Mr. Campos's understanding that contrary to Mr. Campos's advice, Ms. Austin lied about her address so that she and Mr. Alvarez could take advantage of the friendlier motor vehicle title change process in New York.

And during another conversation, Mr. Campos did not blanch when Ms. Austin discussed a possible meeting with the Federal Bureau of Investigation, stating let the "cards fall where they may."

> Mr. Campos: At this point, Susan, I like really want to say, like, you got to do what you got to do in terms of dealing with this. . . . Did you ever meet with the FBI?
>
> Ms. Austin: No, I haven't done that yet.
>
> Mr. Campos: I mean that's part of, you know. . . . I don't know how that affects you as a, as a, you know like a card you play. In other words, like, yo--, I'm a victim, this person told me. . . . Not that you didn't know about the business opportunity, but this opportunity has fallen apart. You were misled to believe that this could happen, and this was this and this was that. And you know, cards fall where they may. Because you shouldn't be victimized repeatedly, right, for or an opportunity that they're not adhering to. I mean, they're not even respecting you enough to call you. But don't do that yet, don't hit the nuclear button yet. Let me see if [Mr. Alvarez] will respond.

Together, these excerpts and the others identified in Attachment B, are critical to placing the government's chosen excerpts in Attachment A, as well as the government's overall narrative, in the proper context. The jury should know that the man supposedly "strategiz[ing]," about how to avoid prosecution did not believe he had done anything wrong, reminded Susan Austin that he always told her to be truthful even when she chose to disregard his advice, and appeared unconcerned to the point of encouragement when she suggested a meeting with the FBI. (Government's Motions *In Limine* at 4).

It is for these reasons that Mr. Campos asks the Court to admit all recordings between him and Susan Austin or, in the alternative, to admit the excerpts identified in Attachment B. To hold otherwise would be to deprive the jury of crucial, relevant evidence necessary to fully assess Mr. Campos's guilt or innocence.

Respectfully Submitted,

HOLLAND & KNIGHT LLP

/s/ Lee Vartan

Lee D. Vartan

*Attorney for Christopher Campos*